IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01054–EWN–MEH

EDWARD K. QUICK,

      Plaintiff,

v.

FRONTIER AIRLINES, INC.,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

      This is an employment discrimination case. Plaintiff Edward K. Quick alleges that

Defendant Frontier Airlines, Inc., has discriminated and retaliated against him in violation of the

Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301

*et seq.* This matter is before the court on "Defendant Frontier Airlines, Inc.'s Motion for

Summary Judgment," filed April 27, 2007. Jurisdiction is premised upon 28 U.S.C. § 1331 and

38 U.S.C. § 4323.

## FACTS

### 1. Factual Background

      On May 30, 2001, Plaintiff interviewed for employment as a pilot with Defendant. (Br. in

Supp. of Frontier Airlines, Inc.'s Mot. for Summ. J. [hereinafter "Def.'s Br."], Statement of

Undisputed Material Facts [hereinafter "SOF"] ¶ 2 [filed Apr. 27, 2007]; *admitted at* Pl.'s Br. in

Resp. to Frontier's Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 2 [filed May 28, 2007].) On June 4, 2001, Defendant sent Plaintiff a letter stating: "You have been placed in a pilot pool for future hiring. Our pilot pool consists of those candidates who will be chosen for a future class date. . . . We cannot give you a specific class date . . . . We look forward to you joining [our company]." (*Id.*, Ex. A–3 [6/4/01 Letter].) Plaintiff understood from this letter that he was going to be considered for future hiring. (*Id.*, SOF ¶ 4; *admitted at* Pl.'s Resp., RSOF ¶ 4.)

In or about September 2001, Plaintiff volunteered to be placed on active military duty in the United States Army Reserve. (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 6.) On February 10, 2002, Plaintiff reported for active duty. (*Id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.) On March 4, 2002, Defendant hired a class of new pilots; this was the first class Defendant had hired since placing Plaintiff in its hiring pool. (*Id.*, SOF ¶ 9; *admitted at* Pl.'s Resp., RSOF ¶ 9.) Plaintiff was not hired with this class. (*See id.*)

Defendant kept Plaintiff in its pilot pool during his military service. (*Id.*, SOF ¶ 14; *admitted at* Pl.'s Resp., RSOF ¶ 14.) Plaintiff was discharged from active duty on February 10, 2004. (*See id.*, SOF ¶¶ 10–11; *admitted at* Pl.'s Resp., RSOF ¶¶ 10–11.) On March 11, 2004, Defendant offered Plaintiff a job as a pilot, which Plaintiff accepted. (*Id.*, SOF ¶ 18; *admitted at* Pl.'s Resp., RSOF ¶ 18.) Plaintiff had not been employed by Defendant at any time prior to March 2004. (*Id.*, SOF ¶ 19; *admitted at* Pl.'s Resp., RSOF ¶ 19.)

### a. *Seniority*

Seniority is important to Defendant's pilots because it is used to determine flight schedules, vacation time, and opportunities for advancement. (*Id.*, SOF ¶ 20; *admitted at* Pl.'s Resp., RSOF ¶ 20.) When Plaintiff was hired, he received the seniority number of 505 based upon his March 2004 hiring date. (*Id.*, SOF ¶ 21; *admitted at* Pl.'s Resp., RSOF ¶ 21.) For the first fifteen months of his employment, Plaintiff never complained or raised any concerns about his hiring or seniority. (*Id.*, SOF ¶¶ 22–23; *admitted at* Pl.'s Resp., RSOF ¶¶ 22–23.)

In June 2005, Plaintiff and another pilot, Frank Anders, made a request pursuant to USERRA that Defendant advance their seniority numbers to the level such numbers would have reached had both men been hired on March 4, 2002. (*Id.*, SOF ¶¶ 26–28; *admitted at* Pl.'s Resp., RSOF ¶¶ 26–28.) Plaintiff and Mr. Anders explained that they had both applied for positions in 2001 and believed that, but for their military service, they would have been hired on March 4, 2002. (*Id.*)

In November 2005, Defendant agreed to advance each pilot's seniority; Plaintiff's seniority number became 309. (*Id.*, SOF ¶¶ 30–31; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 30–31; *see also* Def.'s Br., Ex. A–21 [11/18/05 Letter].) Defendant also gave both men differential back pay and various other benefits based on their newly advanced seniority. (*See* Def.'s Br., SOF ¶¶ 30–31, 34; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 30–31, 34.)

Some of Defendant's pilots opposed Defendant's decision to adjust Plaintiff's and Mr. Anders' seniority, so they formed the so-called "Aggrieved Pilots Group" ("APG"). (*Id.*, SOF ¶ 39; *admitted at* Pl.'s Resp., RSOF ¶ 39.) On January 30, 2006, Defendant met with the

Department of Labor ("DOL"), members of the APG, Plaintiff, Mr. Anders, and representatives

of the Frontier Airlines Pilots Association ("FAPA") to discuss whether Plaintiff and Mr. Anders

were entitled to the advancement Defendant had given them. (*Id.*, SOF ¶ 36; *admitted at* Pl.'s

Resp., RSOF ¶ 36; *see also* Def.'s Br., Ex. A–20 at 3 [DOL Letter].) As a result of the meeting,

the DOL issued a letter stating:

> [T]he protections afforded by USERRA should be construed as a "floor," not a
> "ceiling." Employers may establish rights and benefits exceeding those set forth in
> the statute. [Defendant] complied with the spirit of the statute. Accordingly, we
> have no reason to challenge [Defendant's] decision to retroactively adjust the
> seniority of [Mr.] Anders and [Plaintiff].

(Def.'s Br., Ex. A–20 at 3 [DOL Letter] [citation omitted].) On October 31, 2006, the APG filed

a lawsuit against Defendant, alleging breach of contract and USERRA violations based upon

Defendant's decision to advance Plaintiff's and Mr. Anders' seniority. (*Id.*, SOF ¶ 46; *admitted at*

Pl.'s Resp., RSOF ¶ 46.)

### b. Evidence Relating to Plaintiff's Allegations of Retaliation

#### i. The Promised Letter and Issues with the APG

In November 2005, Plaintiff met with three members of Defendant's management staff:

(1) Jim Sullivan, Vice President of Flight Operations; (2) Cameron Kenyon, Chief Pilot; and (3)

Karin Ranta-Curran, Corporate Counsel. (Pl.'s Resp., Statement of Additional Material Facts

[hereinafter "SAF"] ¶ 1; *admitted at* Corrected Reply of Frontier Airlines, Inc.'s Mot. for Summ.

J. [hereinafter "Def.'s Reply"], Resp. Concerning Undisputed Facts [hereinafter "RSAF"] ¶ 1

[filed July 11, 2007]; *see also* Def.'s Br., Ex. A–21 [11/18/05 Letter].) At this meeting,

Defendant agreed to send a letter to those pilots who would be affected by the advancement of

Plaintiff's seniority. (Pl.'s Resp., SAF ¶ 2; *admitted at* Def.'s Reply, RSAF ¶ 2.) The letter was not sent until March 13, 2006. (*Id.*, SAF ¶¶ 2–3; *admitted at* Def.'s Reply, RSAF ¶¶ 2–3.) Mr. Sullivan testified regarding the apparent delay: "We had originally drafted a letter and sent it to the president of . . . FAPA, and we never got a reply. And we also had — several grievances were rolling at the time. And frankly, you know, just got busy." (*Id.*, SAF ¶ 4; *admitted at* Def.'s Reply, RSAF ¶ 4; Pl.'s Resp., Ex. 7 at 29 [Sullivan Dep.].)

The members of the APG were pilots who held non-management positions with Defendant. (Def.'s Br., SOF ¶ 39; *admitted at* Pl.'s Resp., RSOF ¶ 39.) Pilot Donna Bridges, herself a former Lieutenant Colonel in the Air Force, spearheaded the APG. (*Id.*, SOF ¶ 40; *admitted at* Pl.'s Resp., RSOF ¶ 40.) APG members communicated via email and postings on the FAPA website. (*Id.*, SOF ¶ 41; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 41.) Plaintiff has submitted a collection of postings from the FAPA website, dated from October 2005 through late February 2006, concerning the contested seniority advancement. (*See* Pl.'s Resp., SAF ¶¶ 24–45; *admitted at* Def.'s Reply, RSAF ¶¶ 24–45.) In broad strokes, these postings: (1) accuse Plaintiff and Mr. Anders of manipulating the seniority system; and (2) criticize Defendant for granting the seniority advancement. (*See id.*)

On or about February 22, 2006, Ms. Bridges posted a message recounting that, at the DOL hearing, Plaintiff had represented that "he had not yet resolved all of his back pay issues with [Defendant]." (*Id.*, SAF ¶ 8; *admitted at* Def.'s Reply, RSAF ¶ 8.)[1] Ms. Bridges proceeded

---

[1]Defendant objects to this message as hearsay. (*See* Def.'s Reply, Reply Concerning Undisputed Facts ¶ 45.) Although Defendant notes that Plaintiff failed to submit a copy of the

to state a "management person" told her that Plaintiff had received "a sizable check" from

Defendant for back pay. (*Id.*) In late February or early March 2006, Plaintiff, through counsel,

informed Defendant of his belief, based on Ms. Bridges' February 22 posting, that a member of

Defendant's management was leaking information about Plaintiff. (Def.'s Br., Ex. A–39 [2/06

Correspondence]; *see id.*, SOF ¶ 42; *admitted at* Pl.'s Resp., RSOF ¶ 42.) In response to

Plaintiff's complaint, Defendant issued a letter to its pilots stating that it would not tolerate any

retaliatory actions against Plaintiff. (Def.'s Br., SOF ¶ 43; *admitted at* Pl.'s Resp., RSOF ¶ 43.)

Soon thereafter, Defendant reprimanded three pilots who had posted negative statements about

Plaintiff and Mr. Anders. (*Id.*, SOF ¶ 44; *admitted at* Pl.'s Resp., RSOF ¶ 44.)

### ii. Plaintiff's First Attempt to Upgrade to Captain

Pilots seeking to upgrade to captain must complete training and pass both an oral

examination and a "check ride" in a flight simulator. (*Id.*, Ex. A–8 ¶ 16 [Kenyon Aff.].) The oral

examination and check ride are administered by one of Defendant's pilots who has been qualified

by the Federal Aviation Administration ("FAA") as a Designated Examiner. (*Id.*, Ex. A–8 ¶ 17

[Kenyon Aff.].) It is not unusual for an FAA representative to observe a check ride along with

the Designated Examiner. (*Id.*, SOF ¶ 53; *admitted at* Pl.'s Resp., RSOF ¶ 53.)

On April 11, 2006, Designated Examiner Binny Harke administered Plaintiff's first check

ride. (*Id.*, SOF ¶ 52; *admitted at* Pl.'s Resp., RSOF ¶ 52.) Jimmie Hopkins of the FAA observed

the check ride as a "safety inspector." (*Id.*) Mr. Hopkins is Defendant's former Chief Pilot and a

---

message to this court, Defendant does not dispute Plaintiff's recitation of the contents thereof.
(*See id.*, RSAF ¶ 8.) I return to this evidence below.

social acquaintance of Mr. Sullivan. (Pl.'s Resp., Ex. 7 at 14–17 [Sullivan Dep.].) Plaintiff "believes that [Mr.] Sullivan had engineered [his] failure on the check ride[] and used [Mr.] Hopkins, his close friend, to try to rattle [Plaintiff] before the first check ride, which [Mr.] Hopkins certainly succeeded in doing."[2] (*Id.*, Ex. 1 ¶ 8 [Pl. Aff.].) Plaintiff further believes that Mr. Harke's failure to stop the check ride due to Mr. Hopkins' "inappropriate" behavior constituted retaliation. (Def.'s Br., Ex. A–4 at 219, 221 [Pl. Dep.].) Nevertheless, Plaintiff admits that Mr. Harke acted "professionally" and "fairly" throughout the entire check ride. (*Id.*, SOF ¶ 57; *admitted at* Pl.'s Resp., RSOF ¶ 57.) Plaintiff further admits he failed his first check ride because he made "numerous mistakes," and agrees that he did not dispute any of the mistakes Mr. Harke mentioned during a debriefing session held after the test. (*Id.*, SOF ¶¶ 54–56; *admitted at* Pl.'s Resp., RSOF ¶¶ 54–56.)

### iii. *Plaintiff's Second Attempt to Upgrade to Captain*

If a pilot fails a captain upgrade, the CBA provides that he will be given a second chance. (*Id.*, SOF ¶ 65; *admitted at* Pl.'s Resp., RSOF ¶ 65.) On May 22, 2006, Designated Examiner Keith Wallin administered Plaintiff's second check ride, which was observed by Jack McLaughlin of the FAA. (*Id.*, SOF ¶ 67; *admitted at* Pl.'s Resp., RSOF ¶ 67.) Mr. Wallin determined that

---

[2]Plaintiff testified that he made a formal complaint to the FAA about Mr. Hopkins. (Def.'s Br., Ex. A–4 at 225 [Pl. Dep.].) The evidence shows that the FAA investigated the complaint and determined, *inter alia*, that "the perceived hostile and demeaning conduct by [Mr.] Hopkins toward [Plaintiff] was actually elevated concern" and "[t]here was no evidence that there was any discussion between [Defendant's] management and [Mr.] Hopkins prior to the [check ride]." (Suppl. to Summ. J. Resp., Ex. A–86 [5/8/07 Report] [filed July 12, 2007] [hereinafter "Suppl."].)

Plaintiff made a variety of mistakes, such as giving incorrect instructions to the ground crew, steering the plane past the appropriate taxiway, failing to climb again after leveling off at one-thousand feet, having difficulties correctly rerouting the aircraft, and ceding control of the plane's landing to his copilot.  (*Id.*, Ex. A–45 at 105, 107–08, 110–12, 113–16, 117 [Wallin Dep.], Ex. A–55 [Wallin Notes].)  However, according to Mr. Wallin, the "straw that broke the camel's back" was Plaintiff's failure to call a "slats-and-flaps jam" landing checklist.  (Pl.'s Resp., Ex. 9 at 54, 66 [Wallin Dep.].)  When Mr. Wallin informed Plaintiff of the reasons for his failure, Plaintiff did not contest them.  (Def.'s Br., SOF ¶ 69; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 69.)

Mr. Wallin testified that, prior to the check ride, he had occasionally visited the FAPA website, but that he had not read the "threads" concerning Plaintiff's seniority advancement because "[i]t didn't truly concern [him]."  (Pl.'s Resp., SAF ¶ 20; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 20; *see also* Pl.'s Resp., Ex. 9 at 35–36 [Wallin Dep.]; Def.'s Br., Ex. A–72 [Wallin Dep. Am.] [stating the court reporter erroneously transcribed Mr. Wallin's reference to "threads" on the FAPA web page as "threats"].)  Plaintiff admitted that his seniority advancement did not impact Mr. Wallin.  (Pl.'s Resp., Ex. A–4 at 224 [Pl. Dep.].)  Plaintiff further asserts that Mr. Wallin was "beholden" to Defendant's management because it payed him his full salary while he was temporarily barred from flying by the FAA in spring 2006.  (*Id.*, SAF ¶ 22; *denied at* Def.'s Reply, RSAF ¶ 22.)

### iv.     *The First Investigation*

Plaintiff's application for employment included the following question: "Have you ever been suspended, discharged, or asked to resign by any employer?  Explain fully."  (Def.'s Br., Ex. A–56 at 3 [Pl. Appl.].)  Plaintiff answered "yes" and listed one former employer.  (*Id.*)  Plaintiff asserts that he understood this question only to be asking about his employment history going back ten years because the question was located beneath the heading: "Employment Record – Last 10 Years."  (Pl.'s Resp., Ex. 1 ¶ 9 [Pl. Aff.].)  Beyond the ten-year window, Plaintiff had either been terminated or asked to resign by at least two other employers, American Eagle and Jetstream International.[3]  (Def.'s Br., Ex. A–4 at 57, 92 [Pl. Dep.].)  When Defendant's human resources manager, Mary Tunnell, processed Plaintiff's employment application, she called him to inquire about his termination from American Eagle.  (*See* Pl.'s Resp., Ex. 1 ¶ 9 [Pl. Aff.].)  Plaintiff told Ms. Tunnell he understood that the application had only asked about employers within the past ten years, and Ms. Tunnell assented.  (*See id.*)

On September 8, 2006, Defendant propounded discovery requests to Plaintiff, asking him to reveal all actions in court in which he had participated.  (Def.'s Br., SOF ¶ 75; *admitted at* Pl.'s Resp., RSOF ¶ 75.)  Plaintiff admitted two or three civil actions against former employers, objected to disclosing any non-employment cases, and stated that it was "possible that there could be other, irrelevant, civil actions or proceedings that [he] d[id] not recall at this time."  (*Id.*, Ex.

---

[3]In deposition, Plaintiff also admitted that he had resigned from another employer, United Feeder Service, after he failed a check ride.  (Def.'s Br., Ex. A–4 at 49–50 [Pl. Dep.].)  Plaintiff testified that he did not know if he would have been terminated had he not resigned.  (*Id.*)

A–57 [Interrog. No. 5].) Just before Plaintiff's deposition, Defendant discovered evidence of least one undisclosed employment-related action, a suit Plaintiff had brought against Jetstream International. (*Id.*, SOF ¶ 78; *admitted at* Pl.'s Resp., RSOF ¶ 78.) In deposition, Defendant confronted Plaintiff with regard to an unauthenticated email suggesting that Plaintiff had sued a former employer, Aspen Airways, in 1984 for wrongful discharge after it had terminated him for poor performance. (*Id.*, Ex. A–4 at 120–21 [Pl. Dep.].) Plaintiff testified that he had retained counsel in connection with the matter, but he could not remember if he had filed suit. (*Id.*) Plaintiff further testified that he might have been involved in further lawsuits against other employers, but he could not remember. (*Id.*, Ex. A–4 at 130 [Pl. Dep.].)

In early 2007, pursuant to the CBA, Defendant initiated an investigation into "[Plaintiff's] misrepresentations and omissions about his flying history and employment background." (*Id.*, SOF ¶ 84; *admitted at* Pl.'s Resp., RSOF ¶ 84.) In a letter informing Plaintiff of the proceedings, Mr. Sullivan stated that discovery in the case had revealed Plaintiff's failure to inform Defendant of his firing by at least three past employers for which he had piloted aircraft. (*Id.*, Ex. A–63 [1/26/07 Letter].) Such failure, asserted Mr. Sullivan, raised concerns about Plaintiff's integrity, flying background, and employment history. (*Id.*) Plaintiff was suspended with full pay pending the outcome of the investigation. (*Id.*)

On March 22, 2007, Mr. Sullivan sent Plaintiff a letter stating the investigation had "raised many questions relating to [Plaintiff's] proficiency as a pilot." (*Id.*, Ex. A–64 at 2 [3/22/07 Letter].) Thus, "in order to assure that [Plaintiff's past] proficiency problems" were "no longer an issue," Mr. Sullivan informed Plaintiff that he would be required pass a "recurrent proficiency

check prior to returning to [his] regular schedule." (*Id.*)  Plaintiff challenged this decision by filing a grievance, and on April 10, 2007, the parties agreed that Plaintiff would return to service "expeditiously" and that his initial flights would be with a "Line Check Airman." (*Id.*, SOF ¶ 93; *admitted at* Pl.'s Resp., RSOF ¶ 93.)

### v.    The Second Investigation

On April 25, 2007, Mr. Sullivan sent Plaintiff a letter informing him that, pursuant to the CBA, Defendant was investigating an allegation that Plaintiff had inappropriately answered his cell phone while "taxiing to the gate and acting as an assigned crewmember." (Pl.'s Resp., Ex. B11 [4/25/07 Letter].)  Apparently, this investigation was the result of a complaint filed by the captain of the flight. (*See* Def.'s Reply, Ex. A–84 [4/25/07 Compl.].)  Plaintiff affies that he was cleared of the allegations "after a joint meeting of the FAA, the Union, and [Defendant's] manager." (Pl.'s Resp., Ex. 1 ¶ 10 [Pl. Aff.].)  Given this outcome, Plaintiff concludes that the investigation was "retaliatory." (*Id.*)  Plaintiff also concludes that the captain who reported the incident "may" have been motivated to make a false report in order to blame Plaintiff for the captain's own errors in bringing the plane to the gate. (*Id.*)

## 2.    Procedural History

On June 2, 2006, Plaintiff filed a complaint in this court, alleging Defendant: (1) hired him in March 2002 and, when he returned to Defendant's employ after two years in military service, failed to accord him the so-called "reemployment" benefits to which he was entitled under USERRA; and (2) retaliated against him for asserting his rights under USERRA. (Compl. and Jury Demand [filed June 2, 2006].)

On April 27, 2007, Defendant moved for summary judgment, arguing that Plaintiff's first claim fails on factual, legal, and equitable grounds. (Def.'s Br. at 28–38.) Defendant further argued that Plaintiff's second claim is deficient because Plaintiff cannot prove any of the necessary elements thereof. (*Id.* at 38–50.) On May 28, 2007, Plaintiff filed a response brief, in which he noted that the deposition of Mr. Hopkins had been unavoidably delayed until June 2007. (Pl.'s Resp. at 30 n.2.) On July 11, 2007, Defendant filed a reply brief. (Def.'s Reply.)

On July 12, 2007, Defendant filed an unopposed motion to supplement the summary judgment record to include the deposition testimony of Mr. Hopkins, as well as a letter from the FAA that Plaintiff disclosed for the first time during the deposition. (*See* Suppl.) In this motion, Defendant noted that Plaintiff did not oppose its supplementation provided that he be given the opportunity to file a response thereto. (*Id.* at 2.) On July 13, 2007, I granted Defendant's motion. (Min. Order [filed July 13, 2007].) To date, Plaintiff has filed no response. Regardless, in an abundance of caution, none of my holdings are premised upon the supplemental record.

## ANALYSIS

### 1. *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of

evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2. *Evaluation of Claims*

USERRA was enacted to protect the rights of veterans and members of the uniformed services. *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312–13 (4th Cir. 2001). Much of USERRA is devoted to establishing "reemployment" rights for persons who are absent from their jobs due to service in the uniformed services. *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir. 2006); *see* 38 U.S.C. §§ 4312–19. Additionally, USERRA prohibits employers and prospective employers from discriminating and retaliating against service members based on

either their military service or their assertion of entitlement to rights under USERRA. *See* 38

U.S.C. § 4311(a), (b). Because of USERRA's compelling purpose, "it must be broadly construed

in favor of its military beneficiaries." *Hill*, 252 F.3d at 313; *accord Duarte v. Agilent Techs., Inc.*,

366 F. Supp. 2d 1039, 1045 (D. Colo. 2005). To date, precedent interpreting and

applying USERRA is sparse. *Lewis v. Rite of Passage, Inc.*, 217 F. App'x 785, 786 (10th Cir.

2007) (citing *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 [Fed. Cir. 2001]).

### a. *Plaintiff's Claim for "Reemployment" Benefits*

Plaintiff asserts that, under USERRA, he was Defendant's "employee" *before* being called

to active duty in 2002 and, thus, was entitled to USERRA-established reemployment rights and

benefits when he completed his military service and returned to work for Defendant. (Compl. ¶¶

8–20.) Defendant contends it is entitled to summary judgment on this claim for three independent

reasons: (1) Defendant did not hire Plaintiff until *after* he completed his military service; (2) even

if Plaintiff had been an employee as of March 2002, Defendant provided him everything to which

he would have been entitled under USERRA; and (3) the equitable doctrine of laches bars the

claim because Plaintiff intentionally delayed raising it for the first fifteen months he worked for

Defendant. (Def.'s Br. at 27–36.) Although each of Defendant's arguments has merit, I need

only consider the first.

USERRA broadly, albeit with circularity, defines the term "employee" as "any person

employed by an employer." 38 U.S.C. § 4303(3). It is undisputed that while Plaintiff applied for

employment with Defendant in May 2001 and was accepted into Defendant's "pilot pool for

future hiring" in June 2001, Plaintiff was not *hired* by Defendant until March 11, 2004. (Def.'s

Br., SOF ¶¶ 2, 4, 10–15, 18–19; *admitted at* Pl.'s Resp., RSOF ¶¶ 2, 4, 10–15, 18–19; *see also*

Def.'s Br., Ex. A–3 [6/3/01 Letter].)[4]  Based on these undisputed facts, I find no triable issue of

fact as to whether Defendant employed Plaintiff at any time prior to March 11, 2004.

   Even had Plaintiff not unequivocally admitted that he was not employed by Defendant

prior to March 2004, he would still lose.  The word "employee" is commonly understood to

signify a "person who *works* in the service of another person."  BLACK'S LAW DICTIONARY 543

(7th ed. 1999) (emphasis added).  The record contains no evidence that, at any time before March

2004, Plaintiff did any work for Defendant.  As such, to the extent Plaintiff genuinely entertains

the notion that Defendant hired him *prior* to the completion of his military service, Plaintiff's

position is wholly undermined by both his own admissions and an absence of evidence.  Thus,

Plaintiff has no right to avail himself of USERRA's reemployment protections.[5]

   Finally, I reject Plaintiff's unexplained, questionably coherent, and conclusory assertion

that Defendant "is estopped" from disputing Plaintiff's entitlement to a seniority advancement.

---

[4]Without pausing to propound its relevance, Plaintiff repeatedly reiterates the fact that the
letter accepting him into Defendant's "hiring pool" also states that the "pilot pool consists of
those candidates who will be chosen for a future class date."  (*See* Pl.'s Resp. at 28, RSAF ¶¶ 3,
16–17, 28.)  The court finds such unexplained repetition entirely unenlightening.

[5]In his briefing concerning this claim, the only authority Plaintiff discusses are USERRA
cases where courts found in favor of plaintiffs based on failure to hire claims.  (*See* Pl.'s Resp. at
26–27.)  To the limited extent that the citations in Plaintiff's summary judgment response signal
an intent to move to amend his complaint to assert a failure to hire claim, I explicitly deny any
such implicit motion to amend as vague, untimely, abusive, and contrary to this court's local rules.
*See Green Country Food Mkt. v. Bottling Group, LLC*, 371 F.3d 1275, 1279 (10th Cir. 2004)
(affirming denial of motion to amend claim raised in summary judgment response);
D.C.COLO.LCivR 7.1(C) (2007) ("A motion shall not be included in a response or reply . . . .  A
motion shall be made in a separate paper.").

(*See* Pl.'s Resp. at 28.) Plaintiff has failed to specify what precise iteration of the estoppel doctrine he is asserting, let alone cite or discuss *any* authority supporting his bald assertion. If Plaintiff's counsel could not be bothered to research and support his tepid argument, then this court has no obligation to expend public resources ferreting it out. *See Flores v. Astrue*, 246 F. App'x 540, 543 (10th Cir. 2007) ("'A party's failure to cite any authority suggests either that there is no authority to sustain [his] position or that [he] expects the court to do [his] research.'" [quoting *Rapid Transit Lines, Inc., v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970)]).[6]

### b. USERRA Retaliation

Section 4311(b) of USERRA provides:

> An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter.

38 U.S.C. § 4311(b). Although section 4311(b) does not use the term "retaliation," the gravamen of the subsection is to prohibit adverse action taken in retaliation for involvement in the assertion

---

[6]Regardless, Plaintiff could not prove the elements of estoppel if he tried. Shortly after Defendant advanced Plaintiff's seniority, Plaintiff's counsel asserted that such action constituted an admission of Plaintiff's legal entitlement thereto. (*See* Def.'s Br., Ex. A–32 [12/28/05 Letter from Def. to Pl.'s Counsel].) Defendant responded: "At no time in dealing with [Plaintiff's] claims has [Defendant] admitted <u>any</u> legal liability under USERRA. . . . The seniority adjustment and payment . . . go far beyond the beyond [sic] requirements of the USERRA statute and case law." (*Id.* [emphasis in original]); *see Emery Mining Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1417 (10th Cir. 1984) (requiring, *inter alia*, proof of misrepresentation and reliance thereupon for an equitable estoppel claim).

of the substantive rights established by USERRA. *Wallace v. City of San Diego*, 479 F.3d 616, 625 n.1 (9th Cir. 2007). "In determining whether an employer retaliated against a reservist for [asserting] his rights under USERRA, [courts] must first decide whether the employee [asserted] such rights, thereby coming within the class of persons protected by the statute." *Id.* at 624; *accord Grosjean v. FirstEnergy*, 481 F. Supp. 2d 878, 884–85 (N.D. Ohio 2007) ("Under Section 4311(b), [the p]laintiff must show he took an action protected by USERRA . . . ."). In the case *sub judice*, the parties do not dispute that Plaintiff's assertion of rights places him within section 4311(b)'s class of protected persons, so I presume that he is. *See generally Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004) (holding, for the purposes of a Title VII retaliation claim, that an employee "need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory").

If the employee is within the class of persons protected by section 4311(b), then the court must proceed to evaluate the case under a burden-shifting scheme. Under this scheme, the employee first has the burden of showing, by a preponderance of the evidence, that his assertion of rights under USERRA was "a substantial or motivating factor in the adverse [employment] action." *Wallace*, 479 F.3d at 624; *Lewis*, 217 F. App'x at 786. A "motivating factor" is one the employer "relied on, took into account, [or] considered" in taking the adverse action. *Lewis*, 217 F. App'x at 786 (citing *Coffman v. Chugach Supp. Servs., Inc.*, 411 F.3d 1231, 1238 [11th Cir. 2005]). If the employee satisfies this burden, the employer "may then avoid liability only by showing . . . that [it] would have taken the same action without regard to [Plaintiff's] protected status." *Wallace*, 479 F.3d at 624; *Lewis*, 217 F. App'x at 787.

Defendant argues that: (1) most of the incidents Plaintiff asserts to be retaliatory do not constitute adverse action; (2) Plaintiff has no evidence that either his military status or assertion of USERRA rights was a motivating factor with regard to any possible adverse actions; and (3) Defendant would have taken such adverse actions regardless of Plaintiff's assertion of rights under USERRA. (Def.'s Br. at 38–50.) Plaintiff does not meaningfully engage any of Defendant's arguments. (*See* Pl.'s Resp. at 29–31.) Instead, his brief merely summarizes the five incidents he believes to constitute retaliation: (1) broken promises by Mr. Sullivan and Defendant's Corporate Counsel; (2) Defendant's conspiracy to fail Plaintiff on his first ride check; (3) Mr. Wallin's failing of Plaintiff on his second ride check; (4) Mr. Sullivan's investigation into differences between Plaintiff's representations in his employment application and his discovery responses; and (5) Mr. Sullivan's investigation into Plaintiff's use of a cell phone in the cockpit. (*See id.*) Throughout the course of this summary, Plaintiff offers only *one* record citation and neglects *entirely* to cite or discuss any legal authority that might apply to his claim. (*See id.*) These omissions constitute a stunningly deficient argument in response to the motion for summary judgment. Below, I attempt to impose a legal framework upon this errant scene.

### a.     *The Delayed Letter*

Plaintiff asserts that Mr. Sullivan and Defendant's Corporate Counsel, Jacalyn Peters, "actively and passively retaliated against" him. (*Id.* at 29.) Plaintiff contends that Mr. Sullivan retaliated against him by waiting four months to follow through on a promise to send a letter to the pilots affected by Plaintiff's seniority advancement. (*Id.*) Plaintiff also vaguely alleges that Ms. Peters was complicit in the delay. (*See id.*)

In November 2005, Mr. Sullivan, Mr. Kenyon, Ms. Peters' predecessor, Ms. Ranta-Curran, and Plaintiff had a meeting in which it was agreed that Defendant would advance Plaintiff's seniority. (*Id.*, Ex. 1 ¶¶ 1–2 [Pl. Aff.], Ex. 7 at 28–29 [Sullivan Dep.]; *see* Def.'s Br., Ex. A–21 [11/18/05 Letter].) In that meeting, Defendant also agreed to send a letter to those pilots impacted by Plaintiff's seniority advancement. (Pl.'s Resp., Ex. 1 ¶ 1 [Pl. Aff.], Ex. 7 at 29 [Sullivan Dep.].) There is no evidence that this agreement was reduced to writing. The purpose of the letter was to explain why Plaintiff's seniority was being advanced and to warn that any retaliation or harassment based on the advancement would be prohibited. (*Id.*, Ex. 1 ¶ 1 [Pl. Aff.].) Mr. Sullivan testified that Defendant drafted the promised letter and sent it to the president of FAPA, who never responded. (*Id.*, Ex. 7 at 29 [Sullivan Dep.].) At the same time, asserted Mr. Sullivan, "several grievances . . . roll[ed] in," the department "got busy," and the letter was forgotten. (*Id.*; *see id.*, SAF ¶ 4.)

Plaintiff neglects to refer the court to *any* causal evidence supporting his speculation that Defendant's failure to send the letter was a form of retaliation exacted by Mr. Sullivan. (*See id.* at 29; *see also id.*, SAF ¶¶ 1–4.) It is true that temporal proximity between protected conduct an adverse *action* may support an inference of retaliatory intent. *See Sheehan*, 240 F.3d at 1014 (noting that temporal proximity is one of a "variety of factors" that courts can consider when adducing improper motivation under USERRA). Here, Plaintiff essentially accuses Defendant of an adverse *omission*, which raises the question of when, if ever, a decision *not* to send the letter was made. Beyond bare temporal proximity, the record is devoid of evidence supporting an inference that the omission was intentional. Plaintiff has not attempted to rebut Mr. Sullivan's

testimony that he created the promised letter, forwarded it to FAPA, and then forgot about it in the absence of a response. (*See* Pl.'s Resp., Ex. 7 at 29 [Sullivan Dep.].) Nor does Plaintiff allege that he or his counsel ever did *anything* to remind Defendant of its unmet obligation to send a letter.[7] (*See id.*) Had Plaintiff come forward with some such evidence, the circumstances *might* support a reasonable inference that Defendant's inaction was attributable to some sort of ill will. *See Lewis v. Rite of Passage*, No. 04-cv-01683, 2006 WL 650192, at *8 (D. Colo. Mar. 10, 2006), *affirmed* 217 F. App'x 785 (10th Cir. 2007) (granting summary judgment on USERRA claim where "beyond temporal proximity, [p]laintiff offer[ed] only flawed logic and vague speculation to establish a connection between his military service and . . . termination"); *accord Sanguinetti v. UPS*, 114 F. Supp. 2d 1313, 1319 (D. Fla. 2000); *cf. Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 552 (8th Cir. 2005) (proximity in time between service and adverse action, together with employer's visit to military base while plaintiff was on leave, and employer's inquiry to sergeant whether plaintiff was present at military base and whether plaintiff's presence was "imperative" sufficient to establish discriminatory motive); *Harris v. City of Montgomery*, 322 F. Supp. 2d 1319, 1325 (D. Ala. 2004) (proximity in time between service and adverse action along with employer's statement that plaintiff's military training played role in employment decision gave rise to inference of employer's discriminatory motive). As the record stands, Plaintiff has

---

[7]Plaintiff does assert that, in February 2006, he "became aware" of negative postings on the FAPA website and, thus, directed his attorney to notify Ms. Peters. (Pl.'s Resp., Ex. 1 ¶ 2 [Pl. Aff.].) The letter Plaintiff's counsel sent does not mention Defendant's failure to fulfill its November 2005 promise. (*See* Def.'s Br., Ex. A–39 [2/22/06 Letter from Pl.'s Counsel to Def.].)

failed to satisfy his burden to demonstrate that his protected conduct factored into Defendant's omission.

One need look no further than Plaintiff's affidavit to appreciate the paucity of his bald assertion that Ms. Peters was somehow complicit in the failure to send the promised letter. In his affidavit, Plaintiff does not allege that Ms. Peters was present at the November 2005 meeting. (Pl.'s Resp., Ex. 1 ¶ 1 [Pl. Aff.].) Indeed, Plaintiff's allegations make clear that Ms. Peters replaced Ms. Ranta-Curran as Defendant's Corporate Counsel at some time *after* the meeting. (*See id.*, Ex. 1 ¶¶ 1–2 [Pl. Aff.].) While Plaintiff's argument presumes that Ms. Ranta-Curran or someone else told Ms. Peters about Defendant's unfulfilled promise to send the letter, Plaintiff neglects to come forward with any *evidence* supporting that presumption. (*See id.* at 29.) While this court must view the facts in the light most favorable to Plaintiff, such a duty does not extend to presuming or searching for facts that, if they exist, a diligent litigant could have easily proffered to the court. *See Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) ("Speculation . . . will not suffice for evidence."); *see also DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").[8]

---

[8]Plaintiff tosses in one additional conclusory allegation regarding Ms. Peters, asserting she "egged on" negative postings by Defendant's pilots by supplying Ms. Bridges with "information." (Pl.'s Resp. at 29.) Presumably, this unsupported allegation refers to Ms. Bridges' February 2006 posting, wherein she recounted that a "management person" told her Plaintiff had received back pay. (*See id.*, SAF ¶ 8.) The court notes that although Ms. Bridges was deposed in this matter, Plaintiff neglected to furnish any testimony by her regarding the posting. Even assuming that Plaintiff could overcome Defendant's hearsay objection to the posting, he has neglected to articulate how the disclosure of the information constituted adverse employment action. *But see*

### b.    *The First Check Ride*

Plaintiff gives two bases for his assertion that he failed his first check ride due to Defendant's retaliation against him.  First, Plaintiff asserts that he has proffered circumstantial evidence that a personal relationship between Messrs. Hopkins and Sullivan "creates an inference that [Mr.] Hopkins was acting at the behest of [Defendant's] managers" when he "verbally abused" Plaintiff prior to the check ride.  (Pl.'s Resp. at 30.)  Second, Plaintiff asserts that Mr. Harke, who failed him on the check ride, should have stopped the test, "at least temporarily, to allow [Plaintiff] to recover" from Mr. Hopkins' "verbal abuse."  (*Id.*)  Neither basis has any merit.

In his affidavit, Plaintiff alleged: "I believe[] that [Mr.] Sullivan had engineered my failure on the check ride[] and used [Mr.] Hopkins, his close friend, to try to rattle me before the first check ride, which [Mr.] Hopkins certainly succeeded in doing."  (*Id.*, Ex. 1 ¶ 8 [Pl. Aff.].)  The problem with Plaintiff's "belie[f]" is that he has come forward with scant evidence that Messrs. Hopkins and Sullivan had an ongoing friendship, and *no* evidence supporting his speculation that the two men conspired "to try to rattle" Plaintiff so that he would fail his check ride.  The *best* evidence Plaintiff has is Mr. Sullivan's testimony:

Q    You obviously know [Mr. Hopkins], do you not?

_____

38 U.S.C. § 4311(b) (including "adverse employment action" as an element of a retaliation claim).  Plaintiff does not allege that his receipt of back pay was a confidential matter.  Indeed, Ms. Bridges' posting itself recounts Plaintiff's prior *public* statement — made in the presence of pilots opposing his seniority advancement — that "he had not yet resolved all of his back pay issues with [Defendant]."  (Pl.'s Resp., SAF ¶ 8; *see* Def.'s Br., SOF ¶ 36; *admitted at* Pl.'s Resp., RSOF ¶ 36.)  Additionally, Defendant's management had discussed Plaintiff's backpay issues with FAPA, an entity that represented *all* of Defendant's pilots.  (*See* Def.'s Br., Ex. A–8 ¶¶ 6–7 [Sullivan Aff.], Ex. A–18 [8/25/05 Letter].)

| A | I do. |
|---|---|
| Q | You know him professionally and socially, don't you? |
| A | Yes. |
| Q | Do you know when he stopped being a chief pilot [for Defendant]? |
| A | I believe it was '96 or '97 . . . . |
| Q | Do you socialize with one another outside of the office and business? |
| A | Rarely.  More so when he worked as chief pilot than we do now. |
| | Q      Okay.  Have you ever been to his home? |
| A | No. |
| Q | Has he ever come to your home? |
| A | No. |
| Q | In terms — what is the socializing that you're talking about that you — |
| A | In years gone past, we had a group of us that rode motorcycles on the weekends.  In fact, we were called the Frontiersmen.  [Mr.] Hopkins started that group. |
| Q | Do you still participate in that group? |
| A | Not since I got married. . . . |
| Q | Do you know if [Mr. Hopkins is] still in that particular motorcycle group? |
| A | I believe he sold his motorcycle. . . . |
| Q | Before [Plaintiff] took his first check ride in April of 2006, did you ever talk to [Mr.] Hopkins about [Plaintiff]? |
| A | No. |

(*Id.*, Ex. 7 at 14–17 [Sullivan Dep.].)  Neither this testimony nor any other evidence of record

supports Plaintiff's "mere speculation about [Mr. Sullivan's] influence over [Mr. Hopkins],"

which "is not enough to demonstrate a genuine issue of material fact."  *Bullington v. United Air

Lines, Inc.*, 186 F.3d 1301, 1321 (10th Cir. 1999); *see Bones v. Honeywell Int'l, Inc.*, 366 F.3d

869, 876 (10th Cir. 2004) ("Testimony which is grounded on speculation does not suffice to

create a genuine issue of material fact to withstand summary judgment.").  Thus, I find that

Plaintiff has failed to come forward with sufficient evidence from which a reasonable juror could

infer that Mr. Hopkins was acting at Defendant's behest when he purportedly "attempted to

rattle" Plaintiff at the beginning of the first check ride.

That leaves Mr. Harke. It is undisputed that Mr. Harke was professional and courteous during the check ride, which Plaintiff admits he failed due to "numerous mistakes." (Def.'s Br., SOF ¶¶ 54, 57 *admitted at* Pl.'s Resp., RSOF ¶¶ 54, 57.) Plaintiff testified:

> Q    How do you know [Mr. Harke] had knowledge of your USERRA claim?
> A    I just know that he does.
> Q    Your seniority had been adjusted in the fall of '05, some six months prior to this check ride, right?
> A    Correct.
> Q    And other than you speculation that it was Mr. Harke's intent to discriminate [against] you by allowing Mr. Hopkins of the FAA to act badly, do you have any evidence that Mr. Harke was retaliating against you because of your USERRA claim?
> A    That's what I'm asserting, so that's why we're here. That's what a . . . jury and a court is [sic] going to decide.
> Q    That's not an answer. It's based on your speculation, though, nothing he said?
> A    Yeah, sure, that's what I feel.

(*Id.*, Ex. A–4 at 221–22 [Pl. Dep.].) No reasonable jury would entertain Plaintiff's speculative, attenuated allegation that Mr. Harke was retaliating against him for pursuing a USERRA claim by not stopping the check ride "to allow [Plaintiff] to recover" after Mr. Hopkins "rattle[d]" him. *See Bones*, 366 F.3d at 876. As such, the allegation warrants no further consideration.

### c.    *The Second Check Ride*

Plaintiff next suggests that Mr. Wallin, who failed Plaintiff on his second check ride, did so in retaliation for Plaintiff's assertion of USERRA benefits. (*See* Pl.'s Resp. at 30–31.) Plaintiff appears to suggest that retaliatory intent may be inferred from Mr. Wallin's admissions that he: (1) read "some of the threatening postings on the FAPA website;" and (2) received a copy of an email concerning a former employer's termination of Plaintiff. (*Id.*) Plaintiff further asserts that

Mr. Wallin was "beholden" to Defendant because it payed him his full salary while he was temporarily barred from flying by the FAA in spring 2006.  (*Id.*, SAF ¶ 22; *denied at* Def.'s Reply, RSAF ¶ 22.)

Plaintiff would make much of Mr. Wallin's deposition statement that he held Plaintiff to a "higher standard than the norm," but Plaintiff ignores the context in which the statement was made.  (*See id.*, SAF ¶ 19B.)[9]  When Plaintiff's counsel asked Mr. Wallin if he had held Plaintiff "to a higher standard than the norm," Mr. Wallin admitted that he had, explaining that he told Plaintiff that because he had already failed one check ride, he expected to see a strong showing of Plaintiff's "ability to be captain of the airplane."  (Def.'s Br., Ex A–45 at 52 [Wallin Dep.]; *see* Pl.'s Resp., Ex. 9 at 72 [Wallin Dep.].)  Standing alone, this testimony cannot support a reasonable inference that Mr. Wallin is lying to mask the fact that he failed Plaintiff because of his assertion of entitlement to USERRA rights.

A review of the further evidence Plaintiff offers in support of his theory confirms that this claim is baseless.  Plaintiff notes that Mr. Wallin testified that Plaintiff "probably" would have passed the test had Plaintiff not neglected to call a "slats-and-flaps jam checklist" to his copilot prior to landing the simulated flight.  (*See* Pl.'s Resp., Ex. 9 at 54, 67 [Wallin Dep.].)  Plaintiff insinuates that this failure was insignificant because all he failed to do was to "say the words" to his copilot.  (*See id.*, SAF ¶ 21.)  Plaintiff does not, however, present *any* evidence that the failure to call a "slats-and-flaps jam checklist" prior to landing the simulated flight is an unreasonable

---

[9]Plaintiff offered two different statements of fact numbered "19," so I have designated the second of the two "19B."

basis upon which to premise a failing score on a check ride. (*See id.*) Moreover, Plaintiff makes

no effort to dispute Mr. Wallin's testimony that prior to the check ride, he thoroughly and

specifically briefed Plaintiff on the fact he would be expected to call "*all* applicable checklists."

(Def.'s Br., Ex. A–45 at 52, 55–56 [Wallin Dep.] [emphasis added].) And if all of the foregoing

were not enough to dispel Plaintiff's contention, one can look to Plaintiff's own testimony

regarding his conduct immediately after he was told he failed his second consecutive check ride:

> Q    Yes or no, did you disagree with Mr. Wallin during the debrief[ing] about
>      whether you had failed the check ride?
> A    I didn't say anything to him other than listen to his comments, thank[] him
>      for his time and le[ave].
> Q    And he asked you if you had any questions during the debrief. He solicited
>      your input, didn't he?
> A    I believe yes.
> Q    And you didn't say anything?
> A    No.

(Def.'s Reply, Ex. A–69 at 291 [Pl. Dep.].) Even when viewed in the most favorable light,

Plaintiff's evidence fails to support a reasonable conclusion that he should have passed.

Plaintiff persists with his unavailing attempt to cast doubt upon Mr. Wallin's motives,

asking: "[W]hy does the email marked as exhibit A–60 end up in Wallin's hands if he is not

involved in or [sic] sympathetic with, the [APG]? Why is it given to him, directly or indirectly, by

Glen Davis, who has vociferously attacked [Plaintiff] on the FAPA website?" (Pl.'s Resp. at 31.)

Exhibit A–60 contains both an initial email message from one Glen Davis, Sr., and an email

response from one Charles Hogeman. (Def.'s Br., Ex. A–60 [11/06 Emails].) These messages

are, respectively, dated the second and third days of November *2006*. (*Id.*) The emails discuss

Plaintiff's apparent termination from Aspen Airlines. (*Id.*)

In making this "argument," Plaintiff has not even mustered the minimal effort of furnishing his own *speculation* as to how Mr. Wallin's receipt of a copy of the November 2006 emails supports an inference that Mr. Wallin retaliated against Plaintiff in May 2005.[10] I find that the bare fact that someone gave Mr. Wallin a copy of the emails at some time *after* November 2006 does nothing to help Plaintiff's case. *See Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999) (noting a jury may not premise its findings on "mere speculation, conjecture, or surmise").

It is true, as Plaintiff points out, that Mr. Wallin had read some of the postings of members of the APG at some time prior to conducting the ride check. (Pl.'s Resp. at 31; *see id.*, Ex. 9 at 35–36 [Wallin Dep.].) Nevertheless, there is no evidence that Mr. Wallin participated in any APG activities, was close to any APG members, or had any feelings about Plaintiff's advancement. Indeed, Plaintiff admitted that his seniority advancement *did not impact Mr. Wallin*. (Def.'s Br., Ex. A–4 at 224 [Pl. Dep.].) Plaintiff's abject failure to present facts suggesting that Mr. Wallin harbored any retaliatory animus against him undermines an inference of retaliatory intent.

I have saved Plaintiff's worst argument for last. Plaintiff points out Mr. Wallin's testimony that the FAA precluded Mr. Wallin from flying in the spring of 2006, but that Defendant did not reduce his salary. (Pl.'s Resp., SAF ¶ 22 [citing Ex. 9 at 31, 33 (Wallin Dep.)].) Plaintiff asserts: "it is hard to imagine that [this] would not place [Mr.] Wallin in a position of being vulnerable for termination and thus beholden to management." (*Id.*) Plaintiff

_____

[10]In deposition, Mr. Wallin identified these emails and stated that "Glen Davis, Jr.," gave him a printed copy of them. (Pl.'s Resp., Ex. 9 at 14 [Wallin Dep.].) Plaintiff's counsel did not inquire about when or why Mr. Wallin came into possession of the emails. (*See id.*)

neglects, however, to mention — let alone rebut — Mr. Wallin's testimony about *why* the FAA had precluded him from flying: *he was suffering from cancer.* (*Id.*, Ex. 9 at 31–32 [Wallin Dep.].) One thing that is *not* "hard to imagine" is how a jury would respond to this attempt to cast suspicion on Mr. Wallin's motives. Plaintiff has presented insufficient evidence that retaliatory intent motivated his failure on the second check ride.

### d. The Investigations

Defendant contends that it conducted both formal investigations of Plaintiff because of genuine safety concerns. (Def.'s Br. at 47–50.) I reproduce verbatim the entirety of Plaintiff's response:

> [Mr.] Sullivan has singled out [Plaintiff] during the very course of this litigation in two attempts to fire him. The fact is that [Mr.] Sullivan, in his charging letter, directly refers to [Plaintiff's] deposition testimony and [Plaintiff's] answers to interrogatories is [sic] direct evidence of [Mr.] Sullivan's retaliatory intent. Because neither attempt to discipline [Plaintiff] resulted in any discipline whatsoever, underscores [sic] the fact that the original charges were baseless.

(Pl.'s Resp. at 29.) I consider this argument as it applies to each investigation in turn.

### i. The First Investigation

Plaintiff argues that the fact that the first investigation was premised on his deposition testimony constitutes "direct evidence" that his assertion of rights under USERRA was a substantial or motivating factor in the investigation. (*Id.* at 29.) I disagree. Plaintiff's argument confuses a but-for cause for a motivating factor. *See Lewis*, 217 F. App'x at 786 (stating a motivating factor is one the employer relied on, took into account, or considered in taking the adverse action). I reject the suggestion that once an employee sues his employer under USERRA,

any investigation into the sworn statements the employee makes in connection with the case constitutes "direct evidence" of retaliation. At best, the fact that Mr. Sullivan initiated the investigation based in part on questions regarding Plaintiff's truthfulness in his deposition is *circumstantial* evidence that Plaintiff's protected conduct may have been a motivating factor. *See Adamson v. Mutli Cmty. Diversified Servs., Inc.*, — F.3d —, 2008 WL 274736, at *5 (10th Cir. Feb. 1, 2008) (distinguishing direct and circumstantial evidence). However, this bit of circumstantial evidence is outweighed by a broader look at the facts, undertaken below.

Plaintiff next suggests that retaliatory intent may reasonably be inferred from the fact that the investigation culminated in "[no] discipline whatsoever." (Pl.'s Resp. at 29.) However, an *absence* of remedial action resulting from the investigation hardly supports an inference of retaliatory intent — and, indeed, may well stand as a vindication of the high standard of proof and overall fairness of the investigation. To the court, Plaintiff's focus on "[no] discipline whatsoever" avoids a more illuminating body of circumstantial evidence relating to motive: the manner in which the investigation was executed. If the investigation had been motivated by retaliatory intent, one could reasonably expect its execution to have been flawed. *See generally Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) (noting that "disturbing procedural irregularities," such as the manipulation of criteria, may support an inference that an employer is masking an improper motive). Notably, however, Plaintiff makes no allegations of any such irregularities.

Indeed, beyond a handful of speculative statements, Plaintiff offers no genuine evidence that Mr. Sullivan undertook the investigation in bad faith.[11]  *See Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007) ("[T]he relevant inquiry is not whether the employer's reasons were wise, fair or correct; [it] is whether the employer honestly believed its reasons and acted in good faith upon them.").  Defendant, on the other hand, emphasizes that Mr. Sullivan, as the Vice President of Flight Operations, was specifically entrusted with the responsibility of "maintain[ing] the highest standards of safety for the traveling public and [each of its] employee[s]." (Def.'s Br. at 47–48, SOF ¶¶ 88–89; *admitted at* Pl.'s Resp., RSOF ¶¶ 88–89.)  In opening the investigation, Mr. Sullivan asserted that the inconsistencies between Plaintiff's deposition, interrogatory response, and employment application raised questions about his "flying background," "employment history," and "integrity."  (*Id.*, Ex. A–63 [1/26/07 Letter].)  More specifically, Mr. Sullivan sought to undertake the investigation because Plaintiff's testimony suggested that he had failed to disclose in his employment application at least two "employers who employed [Plaintiff] as a pilot and with whom [Plaintiff's] employment was terminated against [Plaintiff's] will." (*Id.*)  As will be seen, this rationale withstands scrutiny.

Even viewed in the light most favorable to Plaintiff, it is beyond dispute that his deposition testimony is, at the very least, starkly inconsistent with both his employment application and his

---

[11]Plaintiff alleges: "It is my belief that the [first investigation] by [Mr.] Sullivan . . . truly was an attempt to retaliate against me.  I had just testified . . . that I believed that [Mr.] Sullivan had engineered my failure on the check rides and used [Mr.] Hopkins, his close friend, to try to rattle me before the check ride . . . .  I'm assuming [Mr.] Sullivan took this personally and decided to retaliate against me."  (Pl.'s Resp., Ex. 1 ¶ 8 [Pl. Aff.].)

interrogatory response.  For example, in his employment application, Plaintiff listed one former employer in response to the following question: "Have you *ever* been suspended, discharged, or asked to resign by *any* employer.  Explain fully."  (*Id.*, Ex. A–56 at 3 [Pl. Appl.] [emphasis added].)  However, in deposition, Plaintiff admitted he had been terminated by two additional employers for which he had piloted aircraft, American Eagle and Jetstream International.  (*Id.*, Ex. A–4 at 57, 92 [Pl. Dep.].)  Plaintiff has presented this court with an explanation for his failure to list those employers — *i.e.*, his understanding that Defendant's application only concerned employers from within the last ten years.  (Pl.'s Resp., Ex. 1 ¶ 9 [Pl. Dep.].)  However, Plaintiff does not allege that Mr. Sullivan was aware of his ostensibly plausible interpretation prior to the initiation of the investigation.  Absent such knowledge at the time the investigation was opened, no reasonable juror could fault Mr. Sullivan for finding a discrepancy between Plaintiff's application and his testimony.

Additionally, there are ample inconsistencies between Plaintiff's deposition testimony and his interrogatory response.  Defendant's interrogatory asked Plaintiff to list "all actions in court . . . in which [he had] participated."  (Def.'s Br., Ex. A–57 [Interrog. No. 5].)  Plaintiff objected to disclosing litigation not related to employment disputes and listed cases against two former employers, Leading Edge Aviation and Four Corners Aviation.  (*Id.*)  Plaintiff then asserted it was "possible that there could be other, irrelevant, [sic] civil actions . . . that [he] does not recall at this time."  (*Id.*)  Just prior to deposing Plaintiff, Defendant learned that Plaintiff had sued another former employer, Jetstream International.  (*Id.*, SOF ¶ 78; *admitted at* Pl.'s Resp., RSOF ¶ 78.)  In deposition, Plaintiff appears to have admitted this, and further testified that: (1) he could not

recall if he had sued another former employer, Aspen Airways; (2) he had resigned from United Feeder Service after failing to pass a check ride, but he did not know if he would have been terminated had he not resigned; and (3) "he could have swore [sic] [he] mentioned" that he had filed for personal bankruptcy in his interrogatory response. (*Id.*, Ex. A–4 at 49–50, 120–21, 129 [Pl. Dep.].) If these are not revelations that raise serious concerns about an employee's integrity, background, and proficiency, then it is difficult to imagine the sort of statements that would.

If there is any remaining doubt about the propriety of Mr. Sullivan's initiation of the investigation, it is resolved by a further look at Plaintiff's deposition testimony. When asked if there were any other jobs from which he had been terminated, Plaintiff testified:

> Might be somebody else out there, I can't — do not recall. Could be, and that's the best answer I can give you. You're asking me to go back, you know, since the beginning of time and there's — as you can tell, I've been involved in a lot of litigation and for me to remember each and every one is just hard for me to do today; and I've tried to the best of my ability. So if you remember something that I don't and ask me the question, I will answer it at that time for you.

(*Id.*, Ex. A–4 at 130 [Pl. Dep.].) Thus, Plaintiff admitted that he may have been terminated from other jobs, but that he could not remember for certain. Then Plaintiff offered to answer any further questions that *Defendant* might "remember" about his employment history. This testimony is an explicit *invitation* of a further investigation into Plaintiff's employment history. No reasonable juror would infer an improper motive from the fact that Defendant, when so invited, undertook such an investigation — particularly given that Defendant, as Plaintiff's employer, entrusted him with the safety of its passengers and employees.

Thus, the only evidence of improper motive Plaintiff has presented is that the investigation was based on his deposition testimony and interrogatory response. However, Plaintiff has failed to cast doubt on the stated reason for the investigation, let alone argue that the investigation itself was unfair. Rather, his own testimony confirms that Defendant undertook the investigation for legitimate reasons. Consequently, I find that Plaintiff has failed to raise a genuine issue of material fact concerning whether his assertion of rights under USERRA was "a substantial or motivating factor in" Mr. Sullivan's decision to initiate the investigation. *See Lewis*, 217 F. App'x at 787; *see also Lewis*, 2006 WL 650192, at *8 ("Plaintiff's *post hoc ergo propter hoc* argument, without more, is unconvincing and insufficient . . . .").

Even if the investigation had been motivated by Plaintiff's protected conduct, Plaintiff has not rebutted Defendant's contention that he suffered no "adverse employment action" as a result of the investigation. (Pl.'s Resp. at 29; *see* Def.'s Br., 40–42, 48; Def.'s Reply at 38.) No matter how generously the court might construe Plaintiff's response, he did not even *attempt* to reach this essential issue. *See* 38 U.S.C. § 4311(b), (c)(1) (requiring proof of "adverse employment action"); *see also Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2414 (2006) (holding Title VII's "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm"). The closest Plaintiff comes to engaging the issue is his self-defeating assertion that the investigation did not result in "any discipline whatsoever." (Pl.'s Resp. at 39.) Absent any further argument by Plaintiff on this essential aspect of his claim, I will not fashion one on his behalf. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("[D]istrict courts . . . have a limited and neutral role in the adversarial process, and

[ought to be] wary of becoming advocates who comb the record . . . and make a party's case for [him]."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Thus, I find that Plaintiff has failed to raise a genuine issue of fact as to whether he suffered "adverse employment action." As such, Defendant is entitled to judgment as a matter of law on Plaintiff's allegations regarding the first investigation.

### ii. The Second Investigation

The evidence relating to the second investigation does not arc in Plaintiff's favor either. As stated above, this investigation was premised upon a captain's complaint that Plaintiff had improperly answered his cell phone while the aircraft he was piloting was "being marshaled into [an airport] gate." (Def.'s Reply, Ex. A–84 [Captain Compl.].) After receiving the complaint, Mr. Sullivan notified Plaintiff that Defendant would conduct a hearing and investigation into the matter in accordance with the CBA. (Pl.'s Resp., Ex. B–11 [4/25/07 Letter].) Plaintiff asserts that he was ultimately cleared of the complaint "after a joint meeting of the FAA, the Union, and [Defendant's] manager." (*Id.*, Ex. 1 ¶ 10 [Pl. Aff.].)

Other than his allegation that he "believe[s]" the investigation was retaliatory, (*see id.*), Plaintiff furnishes no evidence from which a reasonable juror could infer that the investigation was undertaken to retaliate against him for his USERRA claim. Plaintiff does not allege that the captain's allegations were themselves a form of retaliation.[12] Nor does Plaintiff allege that Mr.

---

[12]Indeed, Plaintiff's assertion that the captain "may have faulted" Plaintiff in order to cover for the captain's *own* error suggests that the complaint was filed for a *non*-retaliatory reason. (*See* Pl.'s Resp., Ex. 1 ¶ 10 [Pl. Aff.].)

Sullivan or anyone else had any reason to doubt the captain's allegations. Nor does Plaintiff allege that anything Defendant did in opening, investigating, or closing the investigation was improper or suspicious. "[M]ere conclusory allegations of motivation do not preclude summary judgment." *Francis*, 452 F.3d at 307 (citation and quotation marks omitted). As such, summary judgment is warranted on this entirely speculative iteration of Plaintiff's retaliation claim.

None of the asserted incidents of purportedly retaliatory conduct, even when considered as a whole, can support a reasonable finding that Defendant sought to retaliate against Plaintiff for pursuing USERRA-based rights. Consequently, summary judgment is warranted on every aspect of Plaintiff's retaliation claim.

### 3. Conclusion

Based on the foregoing it is therefore ORDERED that:

1. DEFENDANT's motion (#90) is GRANTED.

2. The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff, dismissing Plaintiff's claims with prejudice. Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

Dated this 4th day of March, 2008

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge